IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 27, 2004

**STATE OF TENNESSEE v. CHAD KILGORE**

**Extraordinary Appeal from the Criminal Court for Greene County**
**No. 98-CR-287     James E. Beckner, Judge**

———————————

**No. E2003-01112-CCA-R7-CD - Filed July 7, 2004**

———————————

In 1998, the defendant, Chad Kilgore, who was indicted for aggravated assault, was determined to be incompetent to stand trial and ordered into a forensic services unit for treatment. The defendant was never transferred from a local mental health care facility. In 2003, the defendant filed a motion seeking relief from the prior order. After a hearing, the trial court denied the motion and directed transfer. This extraordinary appeal followed. Because the appeal was improvidently granted, it is dismissed.

**Tenn. R. App. P. 10; Appeal Dismissed**

GARY R. WADE, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Clifton Corker and Michael Eastridge, Johnson City, Tennessee, for the appellant, Chad Kilgore.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Berkeley Bell, District Attorney General; and Cecil Mills, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

The defendant was indicted for the March 2, 1998, aggravated assault of Leticia Stewart. According to the indictment, the defendant stabbed the victim "under her eye with a screw driver, penetrating the brain lining." While few other facts regarding the basis of the indictment appear in the record, a letter filed by the defendant as an exhibit to his motion to stay stated that the defendant "stabbed a Comcare staff member in the eye in March 1998, inflicting a horrible injury that required brain surgery and left the [victim] with a case of post-traumatic stress disorder."

On May 8, 1998, only four days after the grand jury indictment, the trial court granted an application for bail, releasing the defendant into the custody of Greene Valley Developmental Center. Conditions of bail required constant supervision and prohibited the defendant from leaving

the Center. Two months later, the defendant sought a competency evaluation, alleging that he was "retarded with temporal lobe seizures, and suffer[ing] from autism." The trial court granted the motion and a December 18, 1998, "agreed order" provided as follows:

1. That the [d]efendant was evaluated pursuant to T.C.A. 33-7-301 by Dr. Carlton S. Stanley, a Board Certified Forensic Psychologist with Frontier Health Assessment Services, Inc. on August 20, 1998.
2. That Dr. Stanley determined that the [d]efendant is incompetent to stand trial on these charges due to mental illness and is in need of long term institutional mental health care.
3. That the [d]efendant poses a substantial risk of harm as defined by T.C.A. 33-6-104(a) because the [d]efendant has inflicted serious bodily harm on the victim in this case.
4. That the [d]efendant is substantially likely to injure others if he is not treated in a forensic services unit. (T.C.A. 33-7-301(b)(4))
5. That treatment in a forensic services unit would be in the best interest of the [d]efendant. (T.C.A. 33-7-301(b)(4))
6. That all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of this [d]efendant.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:
1. That the [d]efendant be committed into the custody of the Commissioner of Mental Health for purposes of hospitalization and treatment of mental illness in a forensic services unit.
2. That the [d]efendant be transferred to the custody of the Commissioner of Mental Health at a forensic services unit designated by the Commissioner.

While the record is unclear as to what transpired over the course of the next four and one-half years, the state and the victim, contrary to the trial court's order, agreed that the defendant should remain at Greene Valley. It further appears that in early 2003, as part of a treatment plan, the Greene Valley staff took the defendant on an outing to a local K-Mart. Although the details of the encounter are not contained in the record, it appears that the defendant was seen by the victim. Thereafter, arrangements were made to transfer the defendant from Greene Valley to the Harold Jordan Center, a forensic services facility in Nashville. As a result, the defendant filed a motion in May of 2003 seeking a stay of the trial court's 1998 order requiring transfer.

At the hearing on the motion to stay, Maureen Bibby, a Ph.D. psychologist at Greene Valley Development Center, testified that she provided mental health care to the thirty-year-old defendant. It was her opinion that during the course of his five-year stay at Greene Valley, the defendant had learned "many more adaptive ways of dealing with stress and discomfort" and had come to understand that "it's not okay to hurt other people." Ms. Bibby asserted that the defendant had become more empathic and that he had not harmed anybody "in a drastic way" since the 1998 attack on the victim. She reported that the defendant had exhibited only minor forms of aggression in recent years, such as knocking a soft drink can from someone's hand or pulling hair. Ms. Bibby

testified that the defendant had adapted to a daily routine and that because he was no longer a danger to others, he did not qualify for admission to the Harold Jordan Center, the only forensic services unit in the state. She further testified as follows:

> [Transfer to the Harold Jordan Center] would have a strong negative effect on [the defendant's] treatment. He's made great treatment strides. He has learned a lot of skills, and he's done very, very well in the treatment program he is in now. Any transition for any adult with mental retardation, especially any adult with autism, is going to be difficult, and we expect some backsliding. But this is a transition to a situation where there are more restrictions than he has in life now, and so the take-home message to [the defendant] will be it doesn't matter how hard you work you're not going to be cut any slack.

While Ms. Bibby acknowledged that the defendant was taken into the community by the Greene Valley staff notwithstanding a court order that the defendant remain on the facility premises, she asserted that it was a component of his treatment. Ms. Bibby also acknowledged that Greene Valley was providing only "training and treatment" to the defendant and was not attempting to help restore his competency so that he could stand trial. She contended, however, that any such attempts would be futile given the extent of the defendant's mental defect.

Joseph K. Newman, a clinical psychologist at Greene Valley who had been acquainted with the defendant for four years, testified that the defendant had been diagnosed with moderate mental retardation and had functioned generally on the level of a five- or six-year-old child. He described a secondary diagnosis of autism, "a chronic disorder . . . primarily characterized by a sense of isolation." Newman stated that he typically saw the defendant two times per week and that his program had three components: encouraging the defendant to respond appropriately in terms of affect, encouraging the defendant to differentiate between emotional responses in others, and exploring the defendant's personal religious values. It was his opinion that the defendant had progressed at Greene Valley and that a transfer to the Harold Jordan Center would cause the defendant to be "upset" and would be "a major issue for a brief period of time." Newman also expressed concern that the transfer would result in the defendant's being further from his family. Although he believed that the defendant was not a danger to himself or the community, it was his opinion that the defendant would never be competent to stand trial. Newman acknowledged, however, that competency had not been a part of the defendant's Greene Valley treatment plan.

A psychiatrist at Greene Valley, identified in the record only as Dr. Dndeean, testified that she had treated the defendant for three years and concurred with the diagnosis of autistic disorder accompanied by mental retardation. She stated that it was her opinion that the defendant had not posed a risk either to himself or to others for approximately two years, during which time he had been stable. According to Dr. Dndeean, the defendant's progress would be hampered by transfer to the Harold Jordan Center because the defendant's illnesses adversely affect his ability to adapt to change. She also expressed concern that the defendant's family, which lived near Greene Valley, would not be able to provide social support in Nashville. It was her opinion that Greene Valley

would provide better psychiatric support for the defendant than the Harold Jordan Center, which uses consulting psychiatrists rather than staff psychiatrists. Dr. DnDeean acknowledged that Greene Valley was not treating the defendant with the goal of establishing his competence to stand trial on the aggravated assault charge.

Kevin Schama, who holds a Ph.D. in psychology and who serves as the director of behavior analysis at Greene Valley, testified that the defendant's support plan included a predictable schedule. A goal was to teach the defendant to interact appropriately with others. It was his opinion that transfer of the defendant would adversely affect his treatment by interrupting his "continuity of care." Dr. Schama indicated that competence issues were beyond the scope of his practice.

The trial court denied the defense motion seeking relief from transfer to a forensic services unit, ruling as follows:

> By an agreed order, [the defendant] was committed to a forensic[] services unit in the Department of Mental Health. It was determined that any alternative placement would not be suitable. Those findings were because [the defendant] had been found to pose a substantial risk of harm to others.
>
> Notwithstanding that order and, apparently, by agreement with the alleged victim's family, the defendant . . . was housed at Greene Valley Development Center here in Greeneville, Tennessee, which is not a forensic unit. That allowance was made with the understanding that the defendant would not be released. The orders of this court provide that [the defendant] was not to be released except by permission or order of this court.
>
> Aggressive behavior on the part of [the defendant] continued until recently.
>
> For some reason, the staff at Greene Valley did not understand that the purpose of [the defendant's] being there was to periodically determine his competence and to make efforts to achieve that goal. Instead, the goal at Greene Valley has been solely to try to place the defendant back in the community, which thwarts every reason the victim's family agreed for him to stay there to begin with.
>
> Witnesses today have testified that [the defendant] will never become competent; but it's hard for this court to understand how that determination can be made without any specific evaluation or treatment for that purpose. . . .
>
> * * *
>
> It could be that it is not in the best interests of [the defendant] to be moved to a forensic unit. This court finds that it is not in the best interests of the community for him to remain here. In this instance, the interests of the community prevail over the interests of [the defendant].

Both the United States and Tennessee Constitutions prohibit the trial of a person who is mentally incompetent. U.S. Const. amend. XIV; Tenn. Const. art. I, § 8; Pate v. Robinson, 383 U.S. 375 (1966); Berndt v. State, 733 S.W.2d 119 (Tenn. Crim. App. 1987). The standard for determining competency to stand trial is whether the accused has "'the capacity to understand the

-4-

nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)).

The process for evaluating an accused's competence to stand trial is governed by Tennessee Code Annotated § 33-7-301, which provides in pertinent part as follows:

(a)(1) When a defendant charged with a criminal offense is believed to be incompetent to stand trial, or there is a question about the defendant's mental capacity at the time of the commission of the crime, the criminal, circuit, or general sessions court judge may, upon such judges own motion or upon petition by the district attorney general or by the attorney for the defendant and after hearing, order the defendant to be evaluated on an outpatient basis. The evaluation shall be done by the community mental health center or licensed private practitioner designated by the commissioner to serve the court or, if the evaluation cannot be made by the center or the private practitioner, on an outpatient basis by the state hospital or the state-supported hospital designated by the commissioner to serve the court. If and only if the outpatient evaluator concludes that further evaluation and treatment are needed, the court may order the defendant hospitalized, and if in a department facility, in the custody of the commissioner for not more than thirty (30) days for further evaluation and treatment for competence to stand trial subject to the availability of suitable accommodations.

\* \* \*

(b)(1) If the court determines on the basis of the mental health evaluation and other relevant evidence:

(A) That the defendant is incompetent to stand trial because of mental illness . . .

(2) Either party may demand a jury trial on the issues.

(3) The court is vested with jurisdiction to conduct the proceedings.

(4) In the proceedings the court shall determine, in addition to the findings required by chapter 6, part 5 of this title, whether the defendant is substantially likely to injure the defendant or others if the defendant is not treated in a forensic services unit and whether treatment is in the defendant's best interest.

(5) If the court enters an order of judicial hospitalization, the defendant shall be transferred to the custody of the commissioner, and if the court finds in addition that the defendant is substantially likely to injure the defendant or others if the defendant is not treated in a forensic services unit and that treatment in such a unit is in the defendant's best interests, the defendant shall be transferred to the custody of the commissioner at a forensic services unit designated by the commissioner. . . .

(c) When a defendant admitted under subsection (b) has been hospitalized for six (6) months, and at six-month intervals thereafter, the chief officer of the hospital shall file a written report with the clerk of the court by whose order the defendant was

confined and shall give a copy of the report to the defendant, the defendant's attorney, the defendant's legal guardian or conservator, if any, and to the district attorney general. . . .

Tenn. Code Ann. § 33-7-301 (emphasis added). Discretion under the statute is vested in the trial court and the trial court's decision will not be reversed absent an abuse of that discretion. See State v. Lane, 689 S.W.2d 202, 204 (Tenn. Crim. App. 1984).

By ordering an evaluation of the defendant's competency and, upon receiving the report that the defendant was incompetent to stand trial, by transferring the defendant to the custody of a forensic services unit, the trial court complied with the terms of Tennessee Code Annotated section 33-7-301. The problem in this instance is that through neglect or otherwise, neither the state nor defense counsel assured compliance with the court order. The parties appear to have proceeded on their own, even dispensing with the bi-annual reports required by section 33-7-301(c). Apparently, the trial court was never made aware of the status of the defendant. Certainly the defendant was never "transferred to the custody of the Commissioner of Mental Health at a forensic services unit." In what appears to be a classic case of "falling through the cracks," some five years later, the defendant still has not been evaluated for purposes of determining whether he will ever be competent to stand trial. Even though the evidence has established that a transfer will negatively affect the treatment of the defendant, the trial court is vested with broad discretionary authority. The injuries to the victim were severe. The defendant has a history of aggressive behavior. In our view, the trial court did not abuse its discretion by ordering that the defendant undergo treatment in an effort to establish his competence to stand trial or by declining to change that order five years after the indictment.

Rule 10 of the Tennessee Rules of Appellate Procedure provides in pertinent part as follows:

An extraordinary appeal may be sought on application and in the discretion of the appellate court alone of interlocutory orders of a lower court from which an appeal lies to the Supreme Court, Court of Appeals or Court of Criminal Appeals: (1) if the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review . . . .

Tenn. R. App. P. 10(a); see also State v. Turner, 713 S.W.2d 327 (Tenn. Crim. App. 1986). In our view, the trial court did not depart from the accepted and usual course of proceedings. Any departure from the norm appears to have been the result of neglect or design on the part of the state or the defense. Because the application for extraordinary appeal was improvidently granted, the appeal is dismissed.

_____
GARY R. WADE, PRESIDING JUDGE